

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed September 8, 2009                  **United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| SCOTT EDWARD DAUGHERTY AND | § | CASE NO. 08-45291-DML |
| SHARON LAURIE DAUGHERTY, | § | |
| | § | CHAPTER 7 |
| DEBTORS. | § | |

**MEMORANDUM OPINION AND ORDER**

Before the court is the *United States Trustee's Motion to Dismiss Under 11 U.S.C. § 707(b)(1)* (the "Motion") filed by the United States Trustee (the "UST"). In response, Scott and Sharon Daugherty ("Debtors") filed their *Response to United States Trustee's Motion to Dismiss Under 11 U.S.C. § 707(b)(1)* (the "Response"). In support of the Motion, the UST filed his *Bench Brief in Support of the United States Trustee's Motion to Dismiss Under 11 U.S.C. § 707(b)(3)* (the "Bench Brief"). On July 9, 2009, the court held a hearing (the "Hearing") on the Motion. At the Hearing, the court heard argument from the UST and Debtors, received a *Stipulation of Facts* agreed upon by Debtors and the UST (the "Stipulation"), and heard testimony by Mr. Daugherty.

1

This matter is subject to the court's core jurisdiction. 28 U.S.C. §§ 1334 and 157(b)(2)(A). This memorandum opinion embodies the court's findings of fact and conclusions of law. *See* FED. R. BANKR. P. 9014 and 7052.

## I. Background[1]

Mr. Daugherty and his now ex-wife divorced in the summer of 2007. Shortly thereafter, Mr. Daugherty's ex-wife moved from Illinois to Texas, taking their twin daughters with her. Because Mr. Daugherty wanted to be closer to his daughters, he moved to Texas that December. Fortunately, his employer, Exelon Power ("Exelon"), which has employed Mr. Daugherty for twenty-seven years as a maintenance supervisor, permitted him to transfer his job to Exelon's power plant in Arlington, Texas. However, Mr. Daugherty's Illinois home sold after his move for less than he expected, and closing of the sale actually cost him $8,000.[2]

Mr. Daugherty testified that, shortly after Christmas 2007, his ex-wife cut off his access to his twin daughters. In response, he hired an attorney to deal with his ex-wife; he was required to pay the attorney a $10,000 retainer. Notwithstanding this action, according to his testimony, the court ordered his child support payments increased by about $500 per month. His ex-wife then decided to return to Illinois with their daughters. Mr. Daugherty fought this in court, too, and as a result, the court ordered his ex-wife not to move from Tarrant County. At the instance of the twins, Mr. Daugherty and his ex-wife reached a compromise that allowed her to move back to Illinois but reduced his child support payments to offset visitation related travel expenses. Now Mr. Daugherty's

---

[1] Except as attributable to Mr. Daugherty's testimony, the following recitation of facts comes from the Stipulation and Debtors' schedules and statement of financial affairs.

[2] At the Hearing, Mr. Daugherty testified that, prior to initiating the move, he had believed he had equity in the Illinois house.

2

ex-wife has moved back to Illinois with their daughters, thus frustrating his purpose for moving to Texas in the first place.

In July 2008, Mr. Daugherty remarried. The new Mrs. Daugherty, his co-debtor, is a homemaker, and the couple has a three-year-old daughter. Mr. Daugherty's employment circumstances have also changed, but not for the better. His income has dropped from approximately $176,000 in 2007 to $152,000 in 2008 and to an estimated $100,000 in 2009. Company-wide budget cuts have eliminated his opportunity to work overtime. At the Hearing, Mr. Daugherty testified that it is his understanding that Exelon plans to sell its Arlington plant. In that event, he will have to seek re-employment with the purchaser, or he will have to move to another Exelon location if a position is available and Exelon agrees.

Debtors filed this chapter 7 case on November 6, 2008. According to their Schedule I, Debtors have a monthly income of $5,061.27 after normal payroll deductions. Approximately $1,135 per month is further deducted to repay moneys borrowed from Mr. Daugherty's 401(k) plan.[3] Debtors received a $14,000 tax refund in 2009 as a result of over-withholding for their 2008 federal income taxes. Mr. Daugherty testified that Debtors used the tax refund for various items including payments to post-petition creditors, costs of litigation in his custody dispute with his ex-wife, childcare,[4] child support, medical bills, clothing, car insurance and maintenance, repairs to Mr. Daugherty's house in Illinois that were prerequisite to its sale, utility bills, reclamation of

---

[3] The loans, incurred in 2005 and 2008, were used to pay Debtors' then unsecured creditors. Mr. Daugherty's testimony at the Hearing suggests the loans may fall within Code § 362(b)(19), and their repayment by deduction from his wages is mandatory. While the evidence is rather sparse for the court to so find, the UST offered no rebuttal.

[4] Mr. Daugherty testified at the Hearing that, although he and Mrs. Daugherty had been paying for childcare, their child is no longer enrolled in childcare services.

pawned personal items, and a freezer (purchased in an effort to save money by buying frozen foods). Mr. Daugherty testified further that only $500 of the refund was devoted to entertainment. He also testified that he has adjusted the amount withheld from his pay and does not expect to receive a tax refund for 2009.

Debtors have approximately $103,226 in unsecured debt, which consists mostly of credit card debt. Within six months prior to filing for bankruptcy relief, in June of 2008, Mr. Daugherty purchased a house in Texas, for which he borrowed $181,354. A month later, he also purchased a 2009 Toyota Camry, after his prior vehicle became inoperable, for which he borrowed $36,040. Debtors also spent $1,120 for modest wedding bands, and $1,100 for a computer that Mr. Daugherty uses for work. While the parties did not stipulate to Debtors' expenses, they did agree that if Debtors reduced their living expenses to correspond with the IRS Standards for Allowable Living Expenses for a household of four people,[5] decreased their electricity bill to $300 per month, and eliminated their expenses for storage and anticipated attorneys' fees,[6] their monthly expenses would be $5,241.81 per month.

**II.   The Issue**

The issue before the court is whether, under the totality of the circumstances, in this case granting Debtors relief under chapter 7 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Code"), would be an abuse of that chapter's provisions.

In 2005, Congress passed the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA"). BAPCPA significantly overhauled the provisions dealing

---

[5] It is not clear to the court that Debtors' household *is* four people; the record only accounts for Debtors and one child.

[6] Based on the record before the court, certainly past history would support the supposition that Mr. Daugherty's ex-wife will cause him to incur future attorneys' fees.

4

with dismissing or converting a chapter 7 case for abuse. *See* Code § 707. For a debtor whose debts are primarily consumer debts, the court may dismiss the case, or, with the debtor's consent, convert the case to chapter 11 or 13, if it finds that granting relief under chapter 7 would be an abuse of that chapter's provisions. Code § 707(b)(1).

In BAPCPA Congress provided a mathematical formula for determining whether a presumption of abuse arises in chapter 7 cases. Code § 707(b)(2). The presumption of abuse does not arise in this case, and in cases like this one, Congress provided an alternative basis for judging abuse. Specifically, in deciding if granting relief would be an abuse of chapter 7 when the presumption does not arise, "the court shall consider (A) whether the debtor filed the petition in bad faith; or (B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation . . . ." Code § 707(b)(3)(A)-(B). The court ruled at the Hearing that the Debtors did not file their petition in bad faith. Thus, the court must now determine whether, under the totality of the circumstances of Debtors' financial situation, granting the Debtors relief under chapter 7 of the Code would be an abuse of that chapter's provisions.

### III. The Motion to Dismiss Pursuant to Code § 707(b)(3)

The UST moves to dismiss pursuant to Code § 707(b)(3)(B) based on Debtors' ability to repay debts, enjoyment of a stable source of future income, eligibility for adjustment of debts through chapter 13 of the Code, "eve-of-bankruptcy" purchases, and ability to negotiate with creditors outside bankruptcy.

In support of the Motion, the UST contends that Debtors are able to repay at least a part of their debts because the prior federal income tax refunds evidence over-

5

withholding of at least $500 per month in taxes, which could be reduced to increase monthly income. Additionally, the UST asserts that Debtors could suspend repayment of the 401(k) loans, that Debtors can reduce their child care expenses,[7] and that Mr. Daugherty's child support payments will soon decrease. Further, the UST asserts that Mr. Daugherty's employment for twenty-seven years with Exelon evidences a stable source of future income. Finally, the UST contends that Debtors' pre-bankruptcy purchases of a home, the 2009 Camry, and consumer goods, and Debtors' ability to negotiate outside bankruptcy warrant dismissal of their chapter 7 bankruptcy as abusive.

### IV. Discussion

#### A. Determining Abuse

The ultimate issue in this case is whether granting the Debtors relief under chapter 7 of the Code would be an abuse of that chapter's provisions under the totality of the circumstances surrounding Debtors' financial situation. Therefore, the court must consider what amounts to "abuse" based on the "totality of the circumstances" in construing Code § 707(b)(3)(B).[8]

In asserting that Debtors' case should be dismissed under Code § 707(b)(3), the UST has the burden of proving abuse by a preponderance of the evidence. *In re Pandl*, 407 B.R. 299, 301 (Bankr. S.D. Ohio 2009); *see also In re Norwood-Hill*, 403 B.R. 905,

---

[7] The UST argues that Mrs. Daugherty should be able to care for the children because she is not employed. Mr. Daugherty testified at the Hearing, however, that the Daugherty child is no longer enrolled in childcare. Even deducting child care expenses from Debtors' budget does not make available disposable income to pay a dividend to unsecured creditors in chapter 13.

[8] The reference to personal service contracts in Code § 707(b)(3)(B) suggests that the "totality of circumstances" includes the purposes behind a debtor's filing of his or her bankruptcy petition. There is no suggestion in the record that Debtors' motive in filing their case was to reject a personal services contract or otherwise use the Code to effect a tactical purpose.

6

912 (Bankr. M.D. Fla. 2009). Since the passage of BAPCPA, courts have continued look to pre-BAPCPA law to determine what constitutes abuse. *See, e.g., In re Pandl*, 407 B.R. at 301 (citing *In re Krohn*, 886 F.2d 123 (6th Cir.1989)). Prior to BAPCPA, section 707(b)(1) provided that a chapter 7 case might be dismissed if the court found "that the granting of relief would be a substantial abuse of the provisions of [that] chapter."

The court is furnished little or no guidance by the post-BAPCPA statute itself or underlying legislative history as to how to determine whether granting relief would be an abuse of chapter 7. A number of courts considering the question have developed a list of factors, addressed below, to aid in considering whether, based on the totality of the circumstances, there has been abuse. The finding of abuse under section 707(b)(3)(B), though, is essentially subjective, based on the court's perception of the evidence, its context, and the credibility of the source. The ultimate issue turns on how the debtor wound up in financial difficulties and the debtor's ability to resolve those difficulties. The court's perception of a debtor's conduct is the key to judging the presence or absence of abuse. Thus, just as Justice Potter Stewart said of pornography, "I know it when I see it." *See Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., Concurring), so, too, a court will recognize abuse when it is present.

Based on Mr. Daugherty's testimony and considering his demeanor,[9] the court is persuaded that he has acted in good faith and has done his best to serve the needs of his family, his employer, and his creditors. It is clear from the evidence before the court that Debtors' financial difficulties are rooted in Mr. Daugherty's efforts to be a good father to his twin daughters. This court is not prepared to translate legal fees incurred to maintain

---

[9] Mr. Daugherty was clearly humbled by his situation. The court could sense nothing in his manner that would suggest he sought relief under chapter 7 other than due to a true need to free himself and his family of financial burdens that seemed overwhelming.

7

proximity to minor children and excessive expenses resulting from a move to achieve the same end and other costs, many of which are a further product of Mr. Daugherty's desire to do right by his family, into abuse of the bankruptcy process. The court is simply not prepared to find in BAPCPA, or former section 707(b)(1), congressional intent to penalize a debtor motivated by concern for his children. Thus, while the court considers the same factors as have other courts facing a similar decision, even if the factors could be found to weigh in favor of granting the Motion, the court would be most reluctant to do so.

**B.  Factors Considered in Finding Abuse**

In determining whether a case should be dismissed under the totality of the circumstances, courts have tested the evidence against the following factors:

(1) circumstances surrounding the debtor's finances, including an ability to pay creditors, whether the debtor's budget is excessive, whether the debtor has reaffirmed a large amount of secured debt, whether there was an incurrence of cash advances or excessive consumer purchases in contemplation of filing, and whether the debtor has a stable income;

(2) the debtor's truthfulness, including whether the schedules accurately reflected the debtor's true financial condition and whether the debtor filed in good faith; and

(3) other factors related to the reason or need for filing,[10] such as whether the petition was filed due to unforeseen circumstances including illness,

---

[10] As the court observed above, the debtor's motive for seeking relief is a factor as well, as suggested by the parenthetical reference in section 707(b)(3)(B) to rejection of a personal service contract.

calamity, disability, or unemployment, and whether the debtor could have negotiated with creditors outside of bankruptcy.

*See, e.g., In re Green*, 934 F.2d 568, 572 (4th Cir. 1991) (a pre-BAPCPA case discussing the ability to repay as a primary, but not a determinative, factor); *In re Krohn*, 886 F.2d 123, 126-27 (6th Cir. 1989) (also pre-BAPCPA, discussing honesty and necessity); *In re Pandl*, 407 B.R. 299, 302-03 (Bankr. S.D. Ohio 2009) (discussing budgetary and income stability factors); *In re Norwood-Hill*, 403 B.R. 905, 912-13 (Bankr. M.D. Fla. 2009) (discussing eligibility for chapter 13); *In re King*, No. 08-41975, 2009 Bankr. LEXIS 35, at *10-*12 (Bankr. E.D. Tex. Jan. 6, 2009) (listing eleven possible factors for consideration).

### C. Applying the Factors

#### 1. Financial Factors

In considering Debtors' finances, factors relevant in this case are Debtors' ability to repay debts, income stability, reasonableness of the proposed budget, and pre-petition purchases.[11]

There is conflict among courts as to whether a debtor's ability to pay a dividend to creditors should factor into the "totality of the circumstances" analysis. *Compare In re Norwood*, 403 B.R. at 912 *with In re Roll*, 400 B.R. 674, 679 (Bankr. W.D. Wis. 2008).[12] Without adopting a position on this issue, the court must start from the absence of a

---

[11] The court is not clear as to how reaffirmation of secured debts should affect its analysis, but the record before the court does not reflect any debt reaffirmations by Debtors.

[12] *See also In re Pandl*, 407 B.R. at 302-03 (considering ability to repay); *In re Booker*, 399 B.R. 662, 671 (Bankr. W.D. Mo. 2009) (considering ability to repay); *In re Stewart*, No. 08-33275-rld-7, 2009 Bankr. LEXIS 458, at *27 (Bankr. D. Or. March 16, 2009); *In re Nockerts*, 357 B.R. 497, 506 (Bankr. E.D. Wis. 2006) (requiring more than an ability to pay be shown to demonstrate abuse).

presumption of abuse under section 707(b)(2). While the majority of courts consider ability to pay in their analysis under section 707(b)(3) regardless of the results the debtor's means test, the absence of a presumption of abuse under section 707(b)(2) weighs the factor at the outset in favor of Debtors.[13]

Debtors' monthly income after payroll deductions is $5,061.27. After subtracting 401(k) loan payments, Debtors' monthly income is $3,978.27.[14] Although Mr. Daugherty has received bonuses from his employer and large tax refunds in the past, based on the evidence, they cannot be expected to continue in the future.

Debtors' expenses, as agreed to by the parties, could be adjusted to $5,241.81 if kept to a bare minimum.[15] Potential child support reductions for Mr. Daugherty's twin daughters are irrelevant because the purpose of the reduced support is to offset traveling expenses for visitation. While the court agrees with the UST that Debtors have not justified their child care expenses, Mr. Daugherty testified at the Hearing that their child is no longer enrolled in child care. Even excluding the cost of child care, however, Debtors' monthly expenses exceed Mr. Daugherty's take-home pay (indeed, even if Mr. Daugherty's deduction for 401(k) loans were eliminated, which the UST has not shown to be appropriate, Debtors' unsecured creditors could expect nothing—or at most a tiny dividend—in a chapter 13 case).

---

[13] The court is unclear whether, given the relationship between sections 707(b) and 1325(b), in a chapter 13 case Debtors would even be required to pay anything to their unsecured creditors.

[14] *See In re Pandl*, 407 B.R. at 302 (considering repayment of retirement plan loans); *In re Freis*, No. 06-30393, 2007 WL 1577752, at *1 (Bankr. W.D. Mo. May 18, 2007) (finding that a debtor's ability to repay a significant portion of their unsecured debt after a 401(k) loan was paid off supported a finding of abuse). In the case at bar, however, such evidence as is before the court indicates Mr. Daugherty's repayment of his 401(k) loans is mandatory, not voluntary.

[15] The Stipulation reflects expenses for a family of four. The UST does not dispute the household size for purposes of the IRS guidelines.

The UST argues that Mr. Daugherty enjoys a good, stable income, making Debtors appropriate candidates for chapter 13. In considering this argument, the court notes that, due to Exelon's expected sale of the Arlington plant, Mr. Daugherty's future employment is uncertain. Furthermore, Mr. Daugherty's annual income has fallen from approximately $176,000 in 2007 to an estimated $100,000 in 2009. This pattern is undeniable and more concrete than the mere possibility of a future downturn or termination. While it is true that Debtors have enjoyed stable income retrospectively, the court's inquiry in considering this factor is necessarily prospective, and Debtors' prospects for a future stable income is uncertain at best.

Concerning Debtors' budget, it appears reasonable to the court. According to Schedule J, the largest expenses in Debtors' budget are loan payments for their home and an automobile. "In considering whether housing expense[s] are excessive, due regard should be given to the size of the family, their reasonable needs, and the cost of alternative housing." *In re Crink*, 402 B.R. 159, 171 (Bankr. M.D.N.C. 2009); *see also In re Rhoades*, No. 08-10758, 2009 Bankr. LEXIS 99, at *15 (M.D.N.C. Jan. 21, 2009). In this case, Debtors purchased a moderately priced and moderately sized home to accommodate the needs of their family. The payments for the house are less than were those for Mr. Daugherty's former Illinois home and are reasonable in light of Debtors' annual income. Payment for a sensible vehicle in the budget is also reasonable because Debtors must have transportation. If the vehicle Debtors chose was more expensive than possible alternatives, it is hardly luxurious; at worst, Debtors were unwise but not profligate in selecting the Toyota Camry. Although Debtors' child care expenses

11

apparently have been eliminated, excluding them does not make room in Debtors' budget for a return to unsecured creditors. In sum, Debtors' budget is reasonable.

In terms of prepetition purchases, the court's inquiry is retrospective. Thus, "a court should examine the nature of the debts incurred, if the debts were consistent with the debtor's financial status, and whether there was an unexplained change in spending patterns—all of which must be considered in light of whether a debtor is taking unfair advantage of creditors." *In re Crink*, 402 B.R. 159, 175 (Bankr. M.D.N.C. 2009) (quoting *In re Beitzel*, 333 B.R. 84, 91 (Bankr. M.D.N.C. 2005)); *In re Jensen*, 2008 Bankr. Lexis 3095, at *17 (Bankr. C.D. Ca. 2008). In this case, Debtors were not extravagant or suspect in their pre-petition purchases. Debtors purchased a modest house to replace the more expensive house in Illinois and replaced a vehicle that had considerable wear and tear with a sensible family car. The electronics purchase was a computer for Mr. Daugherty's work, and the jewelry purchase was for modest wedding rings. Moreover, neither of these purchases was so substantial as to suggest Debtors were by them "taking unfair advantage of creditors." *Crink* 402 B.R. at 175.

Certainly when a debtor incurs debt in anticipation of a bankruptcy discharge or when a debtor incurs debt expecting bankruptcy to relieve financial strain to allow him to repay his newly acquired debt, relief under chapter 7 of the Code might be improper.[16] But the UST has not established by a preponderance of the evidence that Debtors are guilty of such eve-of-bankruptcy spending in this case. Rather, Debtors' purchases were

---

[16] *In re Brenneman*, 397 B.R. 866, 874-75 (Bankr. N.D. Ohio 2008) (where debtors with above-median income and over $400,000 in unsecured debt filed chapter 7 bankruptcy attempting to keep two brand new luxury vehicles that they had just purchased, the court said, "The bankruptcy process, however, was never meant to be used in such a manner -- in essence allowing debtors to perpetuate their bad financial decisions. . . .").

12

both consistent with prior spending patterns and neither so extravagant nor so clearly undertaken in anticipation of bankruptcy as to indicate abuse. [17]

### 2. **Truthfulness Factors**

Good faith conduct is an important factor in analyzing the totality of the circumstances. *See Haney v. Clippard (In re Haney)*, 2007 U.S. Dist. Lexis 17295, at *11 (W.D. Ky. 2007). In this area, the good faith of Debtors in filing and their truthfulness in case documents and testimony must be considered. The court has already found that Debtors filed in good faith. The UST has not alleged that Debtors made any misstatements on their schedules or attempted to hide any assets. Their conduct weighs in Debtors' favor.

### 3. **Other Factors**

The circumstances leading to a debtor's bankruptcy filing should also be taken into account in assessing whether there is abuse under Code § 707(b)(3). The court should consider whether unforeseen events such as illness, calamity, disability, or unemployment triggered the need for bankruptcy relief. *In re Krohn*, 886 F.2d 123, 126-27 (6th Cir. 1989).

If not unforeseeable, the court nevertheless concludes that Mr. Daugherty's dispute with his ex-wife is comparable to an unexpected illness or other calamity. Mr.

---

[17] The court understands questionable purchases of the sort relevant to the instant analysis to be of the kind that are more obviously inconsistent with the debtor's past lifestyle. *See In re Wulf*, 2008 Bankr. LEXIS 3466 (Bankr. W.D. Wash. 2008) (finding that granting chapter 7 relief would be abuse where debtor, formerly the lessee of a moderate apartment, purchased a $335,000 condominium within six months of bankruptcy after using cash advances to inflate his checking account to qualify for the loan); *In re Dotson*, 124 B.R. 836, 839 (Bankr. N.D. Okla. 1991) (granting motion to dismiss chapter 13 case for lack of good faith when, within seven months of filing bankruptcy, debtors purchased two automobiles, ceased making payments on student loans, and incurred substantial debt to take a Caribbean cruise, after they had been living on those student loans for about two years). Debtors' purchases, on the other hand, were consistent with their means and prior lifestyle—and would not alone, without Mr. Daugherty's difficulties with his ex-wife, have led to the filing of bankruptcy.

Daugherty's financial difficulties largely resulted from his decision to follow his twin daughters from Illinois to Texas and from legal action he had to take to maintain his relationship with them. Mr. Daugherty's loss of overtime, the sale at a loss of his Illinois home, and his legal costs all stem from his efforts to be a good father to his daughters. Debtors' resulting financial problems are unfortunate for Debtors and their creditors, but Mr. Daugherty's conduct was well-motivated and not unreasonable and should not count against Debtors as a basis for dismissal.

## V. Conclusion

Although some of Debtors' financial decisions may have been imprudent, they cannot be said to be the result of bad motives. Debtors cannot be accused of playing the system. They had no control over the previous changes and still have no control over the potential changes in Mr. Daugherty's employment situation. Debtors have been truthful and have acted in good faith. This court is loathe to penalize Debtors for a bankruptcy petition brought about by Mr. Daugherty's desire to live near his daughters and maintain his relationship with them. Debtors are precisely the sort of honest people that Congress meant the Code to help. *See Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007). Indeed, "[t]he principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor.'" *Id.* (citing *Grogan v. Garner*, 498 U.S. 286, 287 (1991)). The court finds that the totality of the circumstances does not warrant a dismissal of Debtors' petition in this case. The Motion is therefore DENIED.

It is so ORDERED.

### END OF MEMORANDUM OPINION ###